This order was given some time after a suit had been brought, very inconsiderately and unsuccessfully, by the company, against a vessel of the united states, which they seized in order to obtain payment for tolls* But the justice of the general government would not suffer them to resent the illegal proceeding. Would the executive, distinguished always for their vigilant attention to economy in the expenditure of the public monies, have directed those tolls to be paid, under such circumstances, if they entertained any doubt of the right of the company to demand them ?
The counsel, towards the conclusion of his speech, was kind enough, in a gracious, relenting mood, to say : “ We are not claiming the vested property of the company. Let them *168 keep and use that in the exercise of their constitutional powers. We are contesting their right to demand property, or which is the same thing, money from us.” Many thanks to the learned gentleman, for the intended favor! — he only means to take from us our tolls, our revenues, the only interest or return we can ever have, or expect to have, for our money, and then he will leave untouched our property; our capital, which is already laid out and expended for the public benefit, and gone for ever ! His beneficent intention, in this respect, reminds me of the goodly project of a certain Scotch economist, for expunging the national debt of Great Britain.— Feeling, or pretending to feel, some qualms of conscience at a scheme of public robbery so extensive, ruinous and atrocious, this scrupulous enemy of exclusive rights and privileges proposed that “nathingbut the interest of the debt should be abolished, and that the national creditors should be left at fu’ leeberty to take a’ their vested capítol — whare'er they could find it."
Lastly, it is contended by the prosecutor, that if the charter of the company was rightfully granted, it has been forfeited by the *169 nonfeasance of the company, in not completing the navigation from the bayou St. John to .. . .. the Mississippi river. .
An attentive perusal of the 9th section of the charter, on which this attack is founded, will satisfy the court, that whatever might be the intention, or wish, or purpose of the government in granting the charter, or of the company in accepting it, neither party has promised or stipulated to perform, or cause to be performed, the work which we are alleged to have neglected.
This section enacts, that as soon as we shall have improved the navigation of the bayou, so as to admit, at low tides, vessels drawing three feet water, from the lake to the bridge, we shall be entitled to receive a toll on every vessel passing in or out of the bayou, not exceeding one dollar per ton. That when farther improvement shall permit vessels drawing three feet water, to pass from the said bayou, by the canal Carondelet, to the basin, we shall be entitled to an additional toll, not exceeding one dollar per ton; that when the navigation shall be improved, so as to admit vessels drawing three feet water, from the lake, to any place within one hundred yards *170 of the Mississippi, we shall be allowed a farther toll, not exceeding one dollar per ton; an(j w^en communication between the said navigation and the Mississippi shall be made complete, every vessel passing from or into the said river, shall be liable to a toll, not exceeding five dollars for every foot of her draft.
What is the meaning of this language of the legislature ? If you perform certain services, respecting this navigation, you shall be entitled to a certain reward : when farther services, to a still farther reward. There is no specific engagement, there is no engagement whatever on our part. There is no obligation or liability on the part of the public, until we shall have earned our reward, according to the terms their representatives thought proper to prescribe. This is wholly unlike the ordinary contracts to which it has been compared. In those contracts, each party makes a covenant, a binding promise. I engage to give, or to do so much for you, in consideration of which you engage to give, or to do so much for me: or vice versa. In our case, the engagement, is not positive, but hypothetical. We could break no covenant, for we made none. If we *171 do certain things, we shall enjoy certain pri-vileees. Did the counsel ever know, or can ® he conceive, that an action for breach of covenant could be supported on such a convention, and against the party who makes no covenant whatever ? Suppose the owner of a tract of land should stipulate with a woodcutter in these words — if you will clear one hundred acres of my land, of all the wood growing on it, I will pay you a thousand dollars ; and when you clear another hundred acres in the same manner, you shall have a thousand dollars more. — If this person should clear only ninety-nine acres, he would not strictly be entitled to a cent. But if he cleared one hundred acres, would he not be entitled to his full one thousand dollars, though he should refuse to clear an acre more ? Had we expended our whole capital without being able to get three feet water at low tides, on the whole extent of the navigation from the lake to the bayou bridge, we should not be entitled to demand any toll whatever. But, if with that capital, we had accomplished no more than the proposed improvement of that extent of the inland navigation, surely we should have been entitled to the indemnity expressly *172 stipulated for that specific service. If, after-wards, when urged to clear the canal Caron-delet and the basin, we should plead our inability, the utmost that could be said to us by the public, would be — if you cannot perform this work, we will propose it to some one else. But to deprive us of the wages we have already earned, because it is not in our power to earn any more, would seem, in ordinary cases, an injustice too flagrant to be attempted or thought of.
The laws of all the states which have legislated on the subject of internal navigation, confirm the decision which the common sense and common honesty of mankind would pronounce on this accusation against us. Whenever it is intended, that the non-performance of a specified work or improvement, shall cause a forfeiture of any right or privilege granted, it is so declared expressly; so that if the advantages offered be not deemed equivalent to the risk to be incurred, the charter need not be accepted. In the 19th section of the act for improving the navigation of James river, 1 Virg. Rev. Code, 445, it is provided, that if the company shall not begin the intended work within one year, or shall not com- *173 píete the same within ten years, then all preference in their favor, as to the navigation and tolls in question, shall cease. In nearly all the inland navigation statutes, which I have already quoted, there are similar enactments: and a great many subsequent acts were passed, extending the periods at first limited, instead of rigorously insisting on the right of forfeiting the charters for nonfeasance. So much have these corporations been favored by the enlightened legislatures of the most distinguished states of our confederacy.
The words in the 9th section, “ when the communication between the said navigation of the river Mississippi shall be made complete,” mean nothing more than when the canal shall be extended to the Mississippi: the construction attempted to be given to those words, even if there were any positive stipulation on our part, could only be specious, if the sole purpose of the act had been to open a navigable communication between the bayou and that river. But the purpose of the act, as expressly declared in its first section, as well as by its title, was to “ improve the inland navigation of the territory of Orleans.,? Therefore, according to the extraordinary in- *174 lerpretation for which the learned counsel contend, we should be liable to forfeit our charter for nonfeasance, if any part of that territory which might be susceptible of the contemplated improvements, should remain unimproved. Our charter, in short, would not be secure, until we should make every possible improvement within the range assigned for our operations.
In support of his argument, the gentleman offers the 22d article, p. 92, of the Civil Code. which enacts, that a corporation may be dissolved — first, by an act of the legislature, if they deem it necessary or convenient to the public interest; — and secondly, by the forfeiture of their charter, when the corporation abuse their privileges, or refuse to accomplish the conditions on which such privileges were granted.
The first paragraph of this article can only be construed to extend to those corporations which are formed for internal government, municipal administration, or the like; not to those which embrace contracts with respect to property. 4 Wheat. Rep. 629. The last are protected by that article of the constitution, which forbids state legislatures to pass *175 any law impairing the obligation of contracts. But there is no question, at present, on this subject. We are only required to shew that our charter has not been forfeited by misfeasance or nonfeasance. On this last ground, it would be manifestly very hard to annul our charter and deprive us of our rights, for not performing what we are utterly unable to perform. But the counsel insist on it nevertheless. Like Shylock, they stand upon the law. Well then, rigorous prosecutors, take your pound of flesh, if you can find it in the bond. What is that condition, tell us, which we refuse to accomplish, and on which any privilege exercised or claimed by us has been granted? We claim the privilege of receiving tolls on vessels coming to the bayou bridge, or the basin; the conditions on which that privilege was granted, were, that we should improve the navigation of the bayou, and the canal Carondelet, to a certain specified extent; and we have completely fulfilled those conditions. When you can find in our charter, that the junction of the navigation already completed, with the Mississippi, is made a condition for exercising any right or privilege we have ever claimed, then, but not till then, demand such justice as Shylock would exact.
*176 The statement given by the counsel, of the means of the company for carrying on the navigation of the river, is calculated to make . . • ir , a very incorrect impression. He says, that we have sold lots to the amount of $98,000, besides which, congress had appropriated $25,000, for the purpose of completing the canal. The lots of which he speaks were purchased by us, as the evidence shews, from the charity hospital of this city, for $28,633 8 cents, (all charges included) the whole of which sum was actually paid down; and paid too, out of the monies which might have been justly shared as dividend. These lots wTere afterwards sold by us, not for cash paid down, but on census, as it is termed; that is, for an interest on the capital of the price, the purchaser having the option to pay that capital, or the interest of it, for ever. In this sale, the capital of the price amounted to $98,325, and the interest thereon, stipulated at the rate of 6 per cent., to $5899 50 cents per annum.
It is evident that the purchasers will always prefer, as they have hitherto preferred, paying the interest to paying the capital, so long as the market rate of interest here shall exceed 6 per cent.: and that will probably be *177 tor ages to come. This annual interest, to- ° _ gether with a considerable portion of the toll received, has been, and still is appropriated to making and maintaining the requisite improvements in the navigation. There are many men who would have appropriated the proceeds of so fortunate a speculation in a very different manner: who would have sold those lots, — whose value our improvements had so greatly enhanced — for ready money, and made a dividend of the nett profit, to indemnify themselves in part, for their former losses. But instead of taking this fair advantage of circumstances, the navigation company — those persons, who, according to the counsel, ‘ are thoughtful only of their own pockets’ — reserve the whole gross amount in perpetuity, (without even deducting any thing to replace the purchase money which they had taken from the proper fund of dividends) to promote the public objects of the institution. Their generous and public spirited conduct in this respect will be better appreciated when it is known, that from the granting of their charter in 1805, to the year 1809, and from 1813 to 1818, a period of about nine years, they received no dividend, no Ínteres! *178 w^a^ever on their capital: so great were the expenses of making and maintaining this navi- .. gation. There is scarcely a storm that does . , , , not occasion a heavy loss to the company. The repairs of the damage done to their works by the crevasse of Macarty’s plantation, cost them no less than $23,774 86 cents.
Congress, it is true, did, by their act of Feb. 10th, 1809, 4 Bioren, 201, appropriate the sum of $25,000, to enable the president of the united states to cause the canal of Carondelet to be extended to the Mississippi, so as to admit an easy and safe passage to gun-boats, if he should be convinced that the same ivas practicable, and would conduce to the more effectual defence of this city. Not a dollar of this appropriation was ever received by the company; and no attempt was made to extend the navigation to the river; the president being probably well convinced of the utter inadequacy of the means offered to the end proposed. No evidence has been given of the probable cost of the contemplated work, but we may know what the legislature of this state thought of it, by referring to the act of March 6th, 1819, for the establishment *179 of a company for the purpose of digging and constructing a basin to communicate from the river Mississippi to Marigny’s canal. For that sole purpose, — without having in view the making or extending of any navigable canal,— the general assembly deemed it necessary to allow the company to raise a capital of200,000 dollars.
We are not only not bound, but we are virtually prohibited by our charter from extending the navigation of the bayou and canal Carondelet to the Mississippi. To effect what we have already accomplished, has required the whole of our capital, and a great part of what ought to have been our interest upon it; but we are not permitted to augment our capital, and without a further and very large capital, it is impossible for us to make the navigable communication in question.
There belongs to every speculation of this kind, much of the risk of a lottery. Many canal companies get blanks, and a few have obtained splendid prizes. In Great Britain, there are canal stocks which have yielded dividends of from thirty to fifty-eight per cent, per annum, and whose original shares have been sold at a profit of a thousand per cent. *180 See the London Magazine for 1820, vol. l, pp. 119, 237, 365, 485, 725. Some of the ca-naj compan¡es ¡n Yh-ginia have, I understand, been highly fortunate. Our company’s chance of profit was, for a long time, very slender and precarious. The experiment was new in this territory, and they had every difficulty to struggle with; high wages, inexperienced workmen, sand-bars formed by every gale of wind, in place of those that had been cleared away. At last, by dint of hard labour, patience, perseverance, and a generous spirit of enterprize, they perform their task, and begin to receive a little reward for it. Their prize is, indeed, a very small one; not yet equal to the first cost of the ticket. Their stock for one or two years past has sold at a loss of about fifteen per cent. And notwithstanding all this, they cannot escape envy, hatred and hostility. Notwithstanding all this, we are told by the counsel, that “ if this state of things is sanctioned by law, we must submit, —until legislative omnipotence affords relief.” I doubt the propriety, indeed l doubt the morality of attributing omnipotence — in the most mitigated sense which any idiom of language, any fiction of law, or any figure *181 of the boldest rhetoric would admit — to a legislative body, whose powers are so strictly limited as those of our legislature are, by the .constitution of this state, and by the constitution of the united states; both of which we are all bound, by our solemn oaths, to support. If it were even our dreadful lot to live in one of those enslaved and debased nations, whose impious despots assume to be the vicegerents of the Almighty, I think, that when compelled to address our masters in the language of adoration, we should remind them, at the same time, that their omnipotence, like that of heaven, ought to be exercised con-formably to that sacred and immutable justice, “ whose seat is the bosom of God, whose voice is the harmony of the world.” — The counsel proceeds to say, “ such a state of things, no doubt, was intended by those who granted the charter, more perhaps for their own benefit than the public weal. But it often pleases a good God to confound those rulers who use power for their own emolument, and to protect the oppressed by the blindness of their oppressors.” This is the first time, I believe, that the governor and the legislative council who granted our charter, *182 were ever accused or suspected of such corruption. I am the last person on earth dis-p0ge(j eulogize the character of governor Claiborne; but I will venture to assert, that whether he acted right or wrong, no man ever acted less from the impulse of mercenary motives. And I think I can say as much for that legislative council, whose secretary I was during the whole period of their existence, and with whose measures and views I had the best opportunities of being thoroughly acquainted.
The gentleman asserts, that if the navigation from the bayou to the Mississippi had been complete at the time of the late invasion, our gun-boats would have been saved, and the British army destroyed. Is it possible ! Then these gun-boats must have been captured in the basin, as they were endeavouring to save themselves, having retired from the enemy as far as our incomplete navigation would carry them. Yet I have always understood that they were taken, not in the basin, nor in the canal, nor in the bayou ; no, nor in the lake Ponchartrain, but in the lake Borgne. 1 supposed, from no better information than Latour’s history, and the official *183 accouut of captain Jones, the commander of r the gun-boats, that they had been taken in the Malheureux island passage, on their way to the Petites Coquilles, or the Rigolets, where they had positive orders to “ wait for the enemy, and sink him or be sunk themselves.” Latour's History, p. 58, and appendix, p. 34, 133. The counsel might as well have imputed to the navigation company, the capture of the city of Washington, as the loss of those gunboats. The accusations of the wolf against the lamb, in the fable, have truth and justice in them, compared with this charge against us.
Whatever doubt may be imagined respecting the constitutional validity of our charter, or of any of its provisions, none I presume, can exist, but that we have expended our capital on the improvement of this navigation in good faith. We acted under the sanction of several state laws, and several acts of congress; and in the presence, and until now, with the acquiescence of the public and their representatives, whose interest and duty it was to oppose our proceedings at once if they were illegah Our law — the universal and immutable law of all civilized communities — secures to us the full value of the improvements made *184 w us un(jer these circumstances, even if it eould be held that our charter was invalid. wjj0|e or ⅛ part. Let it not be objected, that a state is a party which cannot be subject to any judgment of this court. That state appears in court as a voluntary suitor. To obtain justice, it must first do justice. A previous indemnity for the whole of our useful expenses, would therefore be the indispensible condition on which the state could be allowed, for itself, or for the citizens at large, to resume the rights which have been granted to the navigation company.
We are told on this subject, by the counsel, that we may rely with unbounded confidence, on the generosity of the state, for ample remuneration for our services: — On that same generosity, in the exercise of which (he adds, by way of encouragement) “ she is prosecuting this suit for the protection of her weak citizens against the extortions of the strong.”
We have no doubt whatever of the justice of the state, that is, of the great body of her citizens; but if her legislature should continue in the same disposition as when they passed their resolutions against us, it is not probable *185 they would pay much regard to any petition ours. Would they not exclaim as we approached their bar to supplicate for remuneration, “ begone, too highly favored monopolists ! Avaunt, ye minions of exclusive privileges ! The forfeiture of your $200,000 is but a just punishment for your nonfeasance and. malfeasance; for your many illegal and oppressive actings and doings.” — But however well disposed they might be towards us, we prefer to claim our rights from the justice, rather than to solicit them from the generosity of our country.
We are unwilling, if we can help it, to rely on the favor of any one ; but we do rely, with unbounded confidence, on the privilege — that invaluable privilege which belongs exclusively to the members of a free state — of demanding our own, not as a boon, but as a birth-right.
On this cause may depend the fate of every corporation in this commonwealth. If such a charter as ours can be forfeited, if the hardly earned privileges it confers can be taken away, if the solemn contract made with us by the public, and religiously fulfilled on our part, can be violated, on the pretences that have been set forth against us, what *186 corporate body can consider itself safe? To say nothing of the principles proclaimed in the legislative resolutions, which cut up and destroy radically all corporations whatever, not even excepting that great corporation, the government of the state ; is there any corporate body existing which might not be accused, and perhaps with truth, of omissions far greater than that which has been unjustly laid to our charge, and strenuously urged as a cause for depriving us of our charter ? Is there any bank, any canal company, any turnpike-road company, any ferry-company; — is there any religious, or political, or charitable, or learned, or commercial corporation which has accomplished, to the utmost extent, every purpose contemplated or intended by the legislature, — which has done all that it could possibly have done to promote all the objects of its institution ?
If the Orleans Navigation Company, whose perseverance, disinterestedness, and self-denying public spirit have been proved on this trial, to an extent seldom found in any joint stock, or any other corporation, be not secure, then it will be time for every one who holds an interest in any such chartered body in this *187 state, to sell it out at any sacrifice: and it would be only fair in that case, to give the J ° _ citizens of the other states, and foreigners also, full notice of the risk they would run by adventuring their funds on speculations, in which, even if all the unavoidable hazards and difficulties attending them should be overcome, there would, at last, be no security.
With these observations, I commit the cause of my clients to the juslice of the court.
(See Post.)