DENTON *v.* WILLCOX et al.

The purchase of a judgment, from which no appeal can be taken, and which is not subject
to be annulled, is not the purchase of a litigious right. The purchase of such a judgment
by an attorney at law is not prohibited by art. 2422 of the Civil Code.
Where the parties to an agreement entered into it for the purpose of defrauding their credit-
ors, neither party can maintain any action on it.

APPEAL from the Commercial Court of New Orleans, *Watts*, J.
  *Benjamin* and *Micou*, for the plaintiff.    *Wilde*, for the appellant, Vason.
The judgment of the court was pronounced by

EUSTIS, C. J.   This controversy grew out of an agreement between the
plaintiff and *J. Willcox*, one of the defendants, of which the following is a copy.
  "Whereas difficulties and embarrassments exist between *G. W. Denton* and
*Jacob Willcox*, arising from their business in New Orleans, under the commer-
cial firm of *Willcox & Fearn*, and from the obligations and endorsements of said
*Denton* for said *Willcox*, as one of the firm of *Willcox, Anderson & Co.*, and
which difficulties the parties have mutually agreed on terms for adjustment of,
to wit:—The said *Denton*, on his part, has agreed that, in consideration of the
said *Willcox* obtaining his release on all the judgment claims held by the Bank
of the United States against him, and which are believed to consist of the fol-
lowing, viz: one for the sum of thirty-eight thousand and thirty-three dollars
and fifty cents; one for the sum of four thousand four hundred 'and eighty-
seven dollars and thirty-nine cents—both with interest from maturity of the
different obligations, sued in the Commercial Court of New Orleans; also from
the judgment or judgments originally obtained by the United States Bank,
against Mr. *Denton*, and now held by *James Erwin*, as well as all other claims
or implications existing against Mr. *Denton*, of every nature or kind, for account
of *Willcox & Fearn*, *Willcox, Anderson & Co.*, or *Jacob Willcox* individually ;
and further, that said *Denton* is to retain for his own use the lands entered for
their joint benefit, in the States of Louisiana, Mississippi and Arkansas, (re-
maining unsold,) the titles to all which, with one exception, were taken, and
stand in the name of said *Denton;* also a small lot of ground in the City of New
Orleans, adjoining the cotton press on Magazine street; also, to retain all the
rent money collected by him, for dues on said cotton press, from *J. S. Wood*,

"Now, in consideration of the foregoing, the said *Denton* has agreed to, and hereby binds himself to hand over to said *Willcox*, as cancelled and satisfied, the notes given to him by said *Willcox*, in settlement of his claim on assets of *Willcox & Fearn*, amounting to $100,000.

"The note of *Willcox, Anderson & Co.*, paid by said *Denton* to the Union Bank of Louisiana, $3,870.

"The obligation of *H. W. & S. Hills*, given him as security or indemnity for any and all losses sustained by him on account of said *Willcox & Co.*

"Also, to reconvey to said *Willcox, or such other person as he may name*, full titles to the house, slaves and furniture in New Orleans, if in his name, situated in Julia street, (in the Thirteen Buildings,) and now occupied by said *Willcox;* also, to convey such titles or claims on nine sections of land in Mississippi, as may belong to him, to *A. & J. Dennistoun & Co.*, which are referred to in the offer made them for settlement of their account against said *Willcox*, and by them accepted.

"And the said *Jacob Willcox*, on his part, hereby covenants and agrees with the said *G. W. Denton*, for and in consideration of the foregoing, on his part, to have him released from any and all claims under the judgments referred to as belonging to the Bank of the United States, or their assigns, or any other claims they may hold on him, for account of said *Willcox*, in any manner whatever; also, to relieve the name of said *Denton*, as endorser on the paper of *Willcox, Anderson & Co.* It being *well understood, that Willcox will need the aid of security the house will give, to complete the agreement on his part, the transfer of title will be made, when so required, for the purpose named.*

"In witness of this agreement, the parties have affixed their signatures, and interchanged the same.

"*New York, October*, 1844.

(Signed) "JACOB WILLCOX,
"G. W. DENTON.

"It is expressly understood by the parties to the above agreement, that all expenses attending the transfers therein named, are to be at the expense of *Jacob Willcox.*"

*Vason*, another of the defendants, had become the owner of the judgments recited in the agreement as belonging to the Bank of the United States. They were against *Denton, Willcox* and *Huntington*, one for $38,146 83, and the other for $4,551 16, both bearing interest. There is a discrepancy between the extract from the judgment docket and the mortgage certificate, as to the dates and amounts of these judgments; but no question as to their identity is made, and we assume the dates recited in the mortgage certificate, the 11th of March, 1843.

The plaintiff obtained an injunction against the issuing of execution on these judgments, tendered a performance of his part of the agreement, and prayed for a perpetual injunction against any future execution on them, and that they be deemed to be satisfied, on the ground that *Vason* held them subject to the conditions of the agreement, that *Willcox* was bound to release *Denton* from the judgments, under the agreement, that *Hills & Co.* purchased them from the trustees of the Bank of the United States on account of *Willcox*, that they were, in fact, parties themselves to the agreement, and on the purchase *Denton* ceased to be bound as a defendant by the judgments, and that *Vason*, holding the judgments through *Hills & Co.*, could derive no greater rights than they possessed, and was subject to all the equities which *Denton* had against the

DENTON
v.
WILLCOX.

original purchasers under the agreement. *Hills & Co.* were made parties defendant, but, disclaiming any interest, withdrew from the suit. *Willcox* was made a defendant, and answered on the merits. No judgment was asked against him; and the issue is between the plaintiff and the defendant *Vason.*

It is charged also in the petition that *Willcox*, or some other person for his use, has an interest direct or indirect in the claim under these judgments, and that if they should be satisfied out of the proceeds of *Denton's* property, part of them will inure to the benefit of *Willcox.* *Vason* denies, in most positive terms, the allegations, so far as they affect him or his rights, which he asserts as a *bonâ fide* purchaser of the judgments, without notice or combination, from *A. T. Burnley & Co.*, to whom they were sold by *Hills & Co.*

The judgment of the court maintained the injunction, except for the sum of $7,971 61, the amount paid by *Vason* to *A. T. Burnley & Co.* for the judgments, and the defendants *Vason* and *Willcox* have appealed, and *Denton* has united in the appeal.

It is charged in the petition that, the purchase by *Vason* was of a litigious right, which, as an attorney and counsellor at law, he was prohibited from making, under the article 2422 of the Code.* We do not conceive that the judgments purchased by him come within the prohibition of that article, and we take this opportunity of remarking that, if there was any thing exceptionable in this transaction on the part of *Mr. Vason* we should feel ourselves bound to notice it, but we are of opinion that he did what he had a right to do, and that his purchase was *bonâ fide*, and that his conduct is not obnoxious to censure.

An exception has been taken in this court to the plaintiff's right of action, that the agreement which the plaintiff seeks to enforce was illegal, immoral and fraudulent throughout, conceived and carried on for the purpose of screening the property of both *Denton* and *Willcox* from their creditors, and consequently that a court never can lend its aid in carrying it into effect.

If the agreement be, and it is alleged, tainted with those vices, our duty is plain, and leaves us no discretion in its performance; and, in order to form a correct opinion of its character and object, it is necessary to go back to its origin.

The plaintiff and *Willcox* were merchants, doing business in New Orleans under the name of *Willcox & Fearn.* They had purchased out the interest of *Fearn.* *Denton* was a silent partner, and by an instrument under private signature, on the 15th June, 1840, sold his interest in the partnership to the defendant *Willcox* for $100,000, for which the latter gave the plaintiff his notes; and, as a further consideration for the sale, *Willcox* agreed to pay a balance appearing to be due *Denton* on the books of the firm of *Willcox & Fearn*, and assumed the payment of the losses on cotton in 1839, which amounted to $66,000, of which *Denton's* share was one half. For the purpose of securing the performance of the conditions of this agreement, which embraced not only what is before stated, but provided for the protection of *Denton* against the debts of the firm of *Willcox & Fearn*, and all his liabilities on account of *Willcox* personally, or of the house of *Willcox, Anderson & Co.*, (a new firm which succeeded *Willcox & Fearn*,) it

---

* The counsel for the plaintiff cited, in support of the position that the purchase by Vason was that of a litigious right, Civil Code, arts. 2422, 2623, 3522, no. 22. The counsel for Vason, on the other hand, cited Favard, *verbo* Droits Litigieux. Troplong, Vente, nos. 200, 201, 202 and authorities there cited. Merlin, Rep. *verbo* Droits Litigieux. Code Nap. Annoté. art. 1700. Code, lib. 8, tit. 37, de Litigiosis. 1 Maynz, Droit Romain, 326. 9 Mart. 183.

was provided that, the titles to the real estate belonging to that partnership, and also that belonging to *Willcox* personally, should stand in the name of *Denton*, and be retained by him as hypothecated for that object. *Willcox* reserved the privilege of selling any of the real estate or slaves thus mortgaged, on furnishing satisfactory security in lieu of that disposed of. *Willcox* assumed all the debts of *Willcox & Fearn*, and *Denton* was to be held harmless.

It appears that this property, which figures in the agreement of 1844, and which never ceased to belong to *Willcox*, was in the name of the silent partner of the bankrupt concern of *Willcox & Fearn*, and by the agreement of 1840 was so to remain. It is stated in the printed argument of *Willcox* that, it had been so placed originally for the purpose of facilitating the transfer of it, should it be required, *Denton* being the only unmarried man of the firm; but it appears that the real object was equally well attained after the marriage of *Denton*, and another purpose was also effected, to which neither of these parties could be strangers—by the property being in the name of *Denton*, it was supposed to be beyond the reach of *Willcox's* creditors. At this time, on the 15th June, 1840 there were these judgments recorded against him, which, in September, 1845, stood on the books of the recorder of mortgages:

1st. A judgment against *Willcox, Anderson & Co.*, jointly and severally, for $7,493 50, with interest from the day of the date thereof, 23d November, 1837.

2nd. Another, against the same parties, for $5,158 64, with interest from its date, November 22nd, 1837.

3rd. Another, against the same parties, for $9,760, with interest from its date, 12th May, 1838.

Having these judgments to meet, besides the loss of the cotton speculation of 1839, $66,000, it is obvious, with all the real estate of the late firm of *Willcox & Fearn*, as well as his own dwelling house, slaves and furniture in the name of the silent partner *Denton*, there were other objects effected by that state of things besides the facilities of conveyance, which no professional man can ask a court of justice to countenance.

The agreement of 1840 was the basis of that of 1844, on which the plaintiff rests his claim for relief. This agreement, made in New York four years after, provides for the conveyance of the Julia Street property, (the dwelling house of Wilcox,) his slaves and furniture, the delivery up of the notes of $100,000 and others held by *Denton*, to *Willcox*, in consideration of the latter's procuring the release of the former from certain judgments which are set forth in the plaintiff's petition, and certain other claims which it is not material now to notice. The last clause of the agreement is the key to the whole, and discloses the original purposes of these parties: "*It being well understood that Willcox will need the aid of the security the house will give, to complete the agreement on his part, the transfer of title will be made when so required for the purpose named.*" That is, is in order to enable *Wilcox* to buy up these judgments, the means must be furnished by *Denton's* uncovering the title and conveying the house; but not to him, *Willcox*, for then it would come under the general mortgages recorded against him, but to *Willcox*, or such other person as he may name.

The counsel of the plaintiff gives this view of the matter in his printed argument. "After the arrival of the procuration to *Josephs*, difficulties arose in reference to the transfer of the property. There were numerous judgments against *Willcox*, many of them, and of large amounts, of prior dates to the

DENTON<br>v.<br>WILLCOX.

judgments now in question; hence *Willcox* did not desire that the property should be transferred to himself, because that step would have placed it most effectually beyond his control."

The judgments recorded against *Willcox* taking precedence of those mentioned in the petition, rendered the latter without value, so far as his name was concerned; and it is apparent that, as *Denton* merely held a mortgage on the property in his name, whenever the debt for which it was given became extinguished, the property must of right fall under the mortgages recorded against the owner, and they also have the benefit of any diminution of the debt. The first mortgage creditor is first in right, and any disposition of the property to his detriment is a fraud, and any agreement between parties, having that for its object, is illegal. *Denton* had no right to give any such direction to property on which he only had a mortgage to the manifest loss of *bonâ fide* mortgagees. A release of his mortgage could not inure to the benefit of *Willcox* at the expense of his creditors.

There were other judgments against *Willcox*, of which we will take the plaintiff's own account. We find what follows in the printed argument of his counsel:

"*Willcox* met with other serious difficulties in his negotiations. In addition to the judgments of which his friends had obtained the control, there were others against him originally belonging to the United States Bank, but which had been sold by the sheriff, at the sale of the various credits belonging to that institution. They were adjudicted to *W. A. Gasquet* and *G. Morgan,* and by them transferred to *A. Erwin.* It would seem that *Erwin* had acquired them under some secret understanding with *Willcox,* and that there was a difference between them as to the balance due, *Erwin* claiming $7,500, and *Willcox* contending that he was bound only for $5,000."

These judgments are also referred to in the agreement of October, 1844. *Willcox* contracted to release *Denton* from them, as well as from those held by the United States Bank. In the agreement they are said to belong to *James Erwin,* but he held them as agent of *A. Erwin.*

But there is another branch of the affair between *Denton* and *Willcox* which is in keeping with the rest of it, and discloses the purpose of their combinations. *Denton* was a silent partner, and *in solido* bound for the debts of *Willcox & Fearn,* and was also involved to the extent of $66,000 on cotton shipments made with *Willcox* in 1839. He held, in his own name, real estate in New Orleans, and lands and slaves in Mississippi and elsewhere, belonging to the firm or to *Willcox,* and retained them as a security for the performance of the condition of the agreement of the 15th June, 1840.

But by the agreement of 1844, on which the plaintiff has founded his action, her etains *for his own use* the lands entered for their joint benefit in the States of Louisiana, Mississippi, and Arkansas, remaining unsold, and a small lot of ground in New Orleans, &c., to the detriment of creditors, who, from the secrecy of his relations towards *Willcox* as a partner, were in the dark as to the ownership of the property and his responsibility as a partner.

That there were unsatisfied claims against *Willcox & Fearn* results from the agreement of 1844, by which *Willcox* binds himself to procure the release of *Denton* from them, and there is a provision in the agreement for the conveyance of lands in Mississippi belonging to *Denton,* to *A. & J. Dennistoun & Co.,* in settlement of their accounts against *Willcox.*

This looks very much like a joint effort of partners to enable a secret partner not only to avail himself of the ignorance of creditors to escape from his liability *in solido*, but to close his own account by the appropriation of partnership property to his exclusive benefit.

Having ascertained, as far as it can be done from the documents before us, the position of *Denton* and *Willcox*, let us examine that of the plaintiff in respect to these two judgments.

The first (5023) was obtained in a suit against *Denton* and others on a bill of exchange, on which *Denton* was an endorser, which was protested in New Orleans, on the 13th June, 1840, for non-payment.

The second (5069) was obtained on *Denton's* own notes, three in number, each dated May 23rd, 1840, payable at thirty, forty-five, and sixty days respectively, to the order of *Willcox*, and each amounting to $5,000, protest of which was waived by the endorser, and on three notes of *Willcox, Anderson & Co.*, endorsed by *Denton*, and protested before the 15th June, 1840, the date of the first agreement.

These suits were instituted on the 5th and 19th April, 1842, respectively, and judgments were obtained on them only in 1843; but on the 6th June, 1842, the plaintiff confessed a judgment in the Parish Court of New Orleans, in favor of *James Erwin* for 63,000 with interest, a portion of which related back to 1837. In December following the confession of judgment, it appears to have been transferred to *Andrew Erwin*, of Tennessee, and being recorded before the two judgments under consideration were rendered, operated as a general mortgage to their detriment on all property in the name of *Denton*. The verity and validity of this judgment is assailed by the defendant *Vason*, who charges that it was a mere cloak, and afforded the means to *Denton* to defy his creditors and those of *Willcox* and weary them out, by standing in the way of a pursuit of their lawful rights.

Bearing in mind the statement of the plaintiff's counsel concerning the relations between *Willcox & Erwin*, which we have just recited, let us hear what his witness says concerning this judgment.

*Jacques*, a witness examined in New York, after stating the understanding between *Denton* and *Hills & Co.* in relation to the purchase of the judgments, says: " *Denton* positively said that he would make title to the house, negroes and furniture, if the latter was in his name, immediately on his arrival in New Orleans; that he was unable to do so at that present time, in consequence of *Mr. James Erwin* holding a certain judgment against him, taking precedence on record to those held by the United States Bank, but that judgment was under his, *Denton's*, control; that he would write to *Erwin* on that day to facilitate his action in the matter on his arrival in New Orleans, when he would make title to the house, &c., either by *directing Erwin* to waive the judgment held by him, or by a formal sale under that judgment, which ever might prove the most feasible plan."

This account of the judgment, of the power *Denton* had over it, and of the purposes to which he could apply it, was given by *Denton* to *Hills & Co.*, on the 19th of November, 1844, previous to the purchase of the judgments held by the trustees of the Bank of the United States. Its effect would be weakened by any comment.

A letter of May 11th, 1845, addressed by one of the *Messrs. Hills* to their agent, which was produced at the request of the plaintiff, is to the same effect.

An extract is to this purport: "*Denton* stated to me, in the presence of a witness, that he had the control of the judgment against him held by *Mr. Erwin*, as well as the titles to the house and lot in Julia street, and, he believed, the negroes and furniture, and would immediately on his arrival in New Orleans make good and sufficient title to the same to you, or our agent," &c.

*Huntington*, another witness for the plaintiff, proves that the plaintiff put another valuable piece of property in the city which belonged to him, the *Harper* property, as it is called by the witnesses, in the name of another person.

*James Erwin* released the property from the judicial mortgage, by an act to that effect, dated the 31st of May, 1845, passed by him as attorney in fact of *Andrew Erwin*.

If we consider this *Erwin* judgment as the plaintiff himself has treated it, what weight can be given to it, or to its transfer to *Andrew Erwin?* We can only treat it as an instrument in the hands of the plaintiff to coerce his creditors to sell their just claims on him to some *mutual friend* for a *bagatelle;* which instrument he used most effectually, and to enable him to complete and accomplish his ends he appeals to the ministers of the law.

The circumstances attending this judgment, its transfer, its non-execution, and the payment of no portion of it for so long a period, its amount, and the uses to which it has avowedly been applied, produce the conviction on our minds as to its origin and purpose, which we cannot avoid, and the whole complexion of the testimony, oral and documentary, without one single exception, fortifies that conviction.

There are a number of letters before us from *Hills & Co.* to their agent in New Orleans, *Mr. Josephs*, who was examined as a witness. They were produced at the instance of the plaintiff. They unmask the whole business. They establish conclusively that it was understood between the parties, that the *Erwin* judgment was a mere cover to prevent the Bank of the United States from recovering their debt; that their judgments, which *Hills & Co.* purchased, were perfectly good for their amounts independent of the contrivances with which these parties embarrassed their collection, and which had enabled *Hills & Co.* to buy them for about a fourth of their value from those who were in charge of the wreck of the late Bank of the United States.

A paragraph from Mr. *Josephs* to *Hills & Co.*, mentioned in one of these letters, is strongly expressive of his opinion of the transactions which are the subject of our enquiry.

" *Mr. Denton* will not take any step adverse to your interest. I know his situation well, and even if he feels disposed to pursue the course apprehended by you, he would not dare attempt it, or provoke the publicity it would occasion."

Concerning the law applicable to this case there can be no question. We have been called upon to apply it in the cases of *Bernard* v. *Auguste.* 1 Annual Reports p. 70, and in *Davis* v. *Holbrook*, Ibid. 176.

All the evidence in this case points to one conclusion, and renders impossible any other hypothesis under the most charitable construction which we are permitted to put on the actions of men. These parties were bankrupt merchants, and it is proved by the plaintiffs own showing that they combined for the purpose of putting their property out of the reach of their creditors, for the object of defrauding them, by first depreciating their debts, by unlawful means, and thereby enabling themselves to purchase them up at an inconsiderable price; that the agreement of 1844 is in furtherance of that combination and plan, and was

entered into with that view alone ; that it is immoral and fraudulent, and that no action for relief can be based on it.

The judgment of the Commercial Court is therefore reversed, and the plaintiff's petition dismissed, with costs in both courts.