(34 South. 860.)

No. 14,594.

SANDERS v. DITCH et al.[*]

(March 16, 1903.)

TRESPASS—LITIGIOUS RIGHTS—PURCHASE—EFFECT.

1. A person who enters upon the land of another, and appropriates the timber thereon, under circumstances justifying the conclusion that, if he did not know that he was without right so to do, it was because he did not choose to know it, is a mere trespasser and depredator, and is liable in damages.

2. "A right is said to be litigious whenever there exists a suit and contestation on the same." This is the controlling definition of the law of this state upon the subject, and it is applicable as well to the public officers mentioned in Civ. Code, art. 2447, as to other persons.

(Syllabus by the Court.)

Appeal from Twenty-Third Judicial District Court, Parish of St. Mary; Albert Campbell Allen, Judge.

Action by Henry J. Sanders against Willard O. Ditch and others. Judgment for plaintiff, and defendants appeal. Affirmed.

Charles A. O'Niell and D. Caffery & Son, for appellants. Foster, Milling, Godchaux & Sanders, for appellee.

### Statement of the Case.

MONROE, J. Plaintiff, in his original petition, alleges that he is the owner of a tract of land, and that William O. Ditch and Joseph Norgress have been and are trespassing thereon and denuding it of its timber; that they have already taken a large quantity, and have on hand a number of logs, which they will remove unless restrained from so doing; and he prays for an injunction, and for judgment perpetuating the same, decreeing him to be the owner of the land, and condemning the defendants in damages. A preliminary injunction issued as prayed for. By supplemental petition, filed the next day, he alleges that after the issuance, but before service, of the writ, 340 logs were removed by the Albert Hanson Lumber Company, Limited, and that they were being towed to its mill; and he prays for an injunction restraining that company from disposing of the same, and for judgment as prayed for in the original petition. And this injunction also issued as prayed for. There-

---

[*]Rehearing denied June 22, 1903.

after the defendants, respectively, asked that the injunctions be released on their giving bonds; and the application of the lumber company was granted, whilst that of the other defendants was denied, which ruling was affirmed on appeal to this court. Sanders v. Ditch et al., 107 La. 333, 31 South. 777. The defendants Ditch and Norgress then appeared by pleadings, in which they alleged that plaintiff is asserting a litigious right acquired by him and by Robert W. Cocke, his immediate author, who is an officer of the court, to wit, a deputy sheriff, with full knowledge that the same could not be enforced without a lawsuit. And "for the sole object of showing that the said plaintiff and said Robert W. Cocke" possessed that knowledge, they allege that Ditch was in possession, as owner, under a title translative of property, before Cocke acquired his pretended rights, and that neither Cocke nor plaintiff nor their authors have ever had possession of the land in question. "Defendants therefore plead that any rights which the pretending heirs of Wm. C. C. C. Martin [Cocke's authors in title] may have had have become absolutely null and void, without admitting that the said pretending heirs ever had any rights to transfer. And reserving the benefit of the foregoing, and in the event that the pretended rights of the pretending heirs of Wm. C. C. C. Martin be decreed not to be null, and in the event any rights really exist, the defendants plead, in the alternative, that they have the right to become released from this litigation upon paying the real price of the transfer, i. e., $1,650, with interest from its date, which defendants are ready and willing to do, if such alleged right be not annulled and be held really to exist."

They further allege that since the filing of this suit the plaintiff has allowed his vendor, Cocke, to sell, to Boru O'Brien and John B. Sanders (the latter being the sheriff and executive officer of the court) an undivided half interest in the right to cut timber from the land in question, subject to the condition that he (plaintiff) succeeds in establishing the claim here set up. They therefore plead as a bar to the suit that it is being prosecuted in the interest, in part, at least, of the officers of the court; and they assert that, if O'Brien has acquired any rights in the premises, they are entitled to be relieved of the litigation, as to him, "by paying the real price of the transfer, with interest from its date, which they are willing and ready to do, if any rights actually exist in said O'Brien."

This pleading concludes with a prayer that John B. Sanders, Robert R. Cocke, and Boru O'Brien be made parties, and that the injunction be dissolved and the suit dismissed; and "they further pray (1) that any rights which the alleged heirs of Wm. C. C. C. Martin may have had be decreed to be null and void; and, in the alternative, (2) that if said pretended rights be decreed to be not null, and if such alleged rights really exist, that defendants be allowed to relieve themselves of any further litigation by availing themselves of the privilege authorized by article 2652 of the Revised Civil Code of this state, and, in any event, that the present suit be dismissed, and the writ of injunction dissolved."

No further action appears to have been taken to bring Cocke, O'Brien, or John B. Sanders into the litigation, though the two first mentioned were examined as witnesses. This pleading was dealt with as an exception, and, after a protracted trial and the hearing of much testimony, was overruled. Ditch then filed an exception of no cause and no right of action, which, we suppose, was also overruled, after which he answered, alleging that he is the owner and possessor of Inglewood Plantation, and that the property claimed by plaintiff is included therein; the nature of his title being set forth at length. He also sets up certain grounds of estoppel as against the plaintiff, alleges injury from the injunction, and prays for the dismissal of the suit, with damages.

There was judgment against the defendants, perpetuating the injunction, condemning them in solido in the sum of $850, rejecting the demands of Ditch, and decreeing the plaintiff to be the owner of the property claimed by him. The defendants have appealed, and the plaintiff has answered, praying for an increase in the amount of the moneyed judgment.

It will perhaps facilitate a better understanding of the case to make a statement of the particular question at issue before recapitulating in detail the facts relied on by the litigants as supporting their respective contentions. And in order that such state-

ment may be intelligible, we shall refer to the subjoined Sketch B, which has been prepared, with such omissions and additions as have seemed to us admissible and proper for the purposes of this opinion, from an original offered in evidence on behalf of plaintiff.

Agreeably to reports Nos. 33, 35, and 36 of the Register of the United States Land Office, and to an act of Congress confirming the same, Robert Martin acquired three contiguous tracts of land, extending, from a point about 7 arpents below the confluence of Bayous Bœuf and Ramos, up Bayou Bœuf, on both sides, in a southeasterly direction, for about 100 arpents; and he sold the property so acquired to Wm. C. C. C. Martin, to whom both the litigants now before the court trace the titles set up by them. As the land here in controversy lies wholly upon the east side of the bayou, only so much of the original surveys as lies upon that side is represented on the sketch:

SKETCH B.

Upon August 7, 1900, the defendant William O. Ditch bought of J. B. Lyons the Inglewood Plantation, according to a description which he alleges includes all the land contained in the tract designated on the Sketch B by the letters A, C, R, K, M, P, O, with the exception of the lot U, T, S, C, or its equivalent, as will be explained. And he subsequently began "pulling" the timber from the northeast end of the tract, including that contained in the triangle R, H, X; and he and the other defendants were so engaged when restrained by the injunctions herein issued. In May, 1901, Robert W. Cocke, at that time a deputy sheriff of the court a qua, bought from the heirs of Wm. C. C. C. Martin the tract designated on the Sketch B by the letters W, H, G, F, N, which, as appears, included the triangle R, H, X, from which the defendants were pulling timber. This purchase was made with money furnished by the plaintiff, H. J. Sanders, on whose behalf it is insisted that Cocke acted as his agent. Pretermitting that question, Cocke immediately conveyed the property to the plaintiff by an act which contained a stipulation for the maintenance of an agreement which he had entered into with Boru O'Brien, whereby the latter was to have the privilege, in the event of the maintenance of Cocke's title, of taking timber from the land on paying $2 per 1,000 feet; and, after Cocke had conveyed the property to the plaintiff, the latter entered into a written contract with O'Brien and John B. Sanders, sheriff of the parish, who, it seems, had been originally interested with O'Brien, whereby they are to take three-fourths of all the timber on paying the price mentioned, provided, always, that they shall be put in possession for that purpose. The plaintiff then instituted this suit; his contention being that Inglewood Plantation, as acquired by the defendant Ditch, is embraced within the tract A, B, U, T, S, J, K, M, P, O, and does not include the triangle C, R, J, within which is the smaller triangle, R, H, X, claimed by him.

It will thus be seen that the main question is whether the northern side line of Inglewood Plantation runs N., 58° 30' E., and is properly established as the line U, T, S, J, or whether it runs N., 13° 30' E., and is properly established as the line C, X, R.

The particular facts developed in support

of the one side or the other of this question are as follows:

Upon January 22, 1848, Wm. C. C. C. Martin sold to John Dooley a tract of land, beginning at a point "10 arpents below the upper line of the tract 'designated in Com. Rep. as 16 deg. 35," and extending down Bayou Bœuf (in a northwesterly direction), for 20 arpents, "with the ordinary depth of 40 arpents"; and upon the same day he sold, to Dr. John Tarleton, "a tract of land, situated in the parish, on Bayou Bœuf, with a front of thirty arpents on said bayou, commencing on the right bank, at the upper line of Dooley, and running up the Bayou Bœuf to the lines of the vendor, with the ordinary depth of forty arpents, and known in the commissioner's report as Nos. 35 & 36."

· It will be noted in this connection, and hereafter that the expressions "upper line" and "lower line" refer to the course of the bayou, from which it follows, as the bayou runs in a northwesterly direction, that the upper line, considered from that point of view, is the lower line, considered with reference to the points of the compass. In 1851 Dooley sold the land purchased by him to Jas. N. Wofford, and in 1857 Dr. Tarleton brought an action in boundary against Wofford, as a result of which it was determined that the side line between their respective tracts ran northeast, forming approximately a right angle with the bayou. The Dooley tract was at a subsequent period divided into two, each having 10 arpents front on the bayou by a depth of 40 arpents; and, of these, the southern tract has become merged in that formerly owned by Tarleton (now owned by Pharr), and the northern or lower tract has become merged in Inglewood Plantation, and is designated on Sketch B as "Dooley Tract," and also as No. 1.

Very shortly after the sales to Dooley and Tarleton, i. e., on the 2d of February, 1848, Martin sold to Edwin Stansbury "a certain tract or piece of land, situated on Bayou Bœuf, in the parish of St. Mary, at the mouth of the Bayou Ramos, fronting 7 arpents, more or less, on the northern side of the Bayou Bœuf, bounded below [to the northwest] by the land of the vendee, and above [to the southeast] by the Bayou Ramos, being a triangular fraction of a certain tract of land, known as No. 33," etc. (Indicated on Sketch

B as "Ramos Lumber Co.," and also as No. 2.)

And upon February 11, 1848, he sold to Alonzo H. Sanders "a certain tract or parcel of land, lying, situate, and being in the parish of St. Mary and state aforesaid, on the northeast side of Bayou Bœuf, beginning on the lower [northern] line of John Dooley, and running down said bayou front, 41 arpents, to the lower or west bank of the Bayou Ramos, with a depth of forty arpents, containing the quantity of 1,640 arpents, more or less." (Designated on Sketch B as No. 3.)

Upon April 3, 1859, Alonzo Sanders sold to John A. Bryant a tract of land on the north side of Bayou Bœuf, "with a front of 19 arpents and a depth of forty arpents, the front of 19 arpents including the Bayou Ramos; bounded, below by the lands of Edwin Stansbury and land of Wm. C. C. C. Martin, and above by the lands of Alonzo Sanders, the present vendor." (Indicated on Sketch B as No. 4, also as "Ramos Lumber Co.") And upon the same day he sold to J. Y. Sanders a tract on the north side of Bayou Bœuf, "with a front of 25.50 arpents, more or less, bounded below by the land of John A. Bryant, and above by the land owned by John Dooley."

Alonzo Sanders, it may be remarked, was the brother of the present plaintiff, who represented him in making these sales; and J. Y. Sanders, the vendee last mentioned, was their father. The property referred to (that is to say, the tract indicated on Sketch B as No. 5) then passed through different hands. One of the owners, in 1868, added to it the Dooley tract, as it originally stood. Another, in 1870, sold the south half of that tract, retaining the north half as part of Inglewood Plantation. Still another, in 1874, sold the lot indicated on the Sketch B by the letters "R. R. Co.," describing it as "fifteen acres, more or less, measuring 417.5 feet, more or less, front on Bayou Bœuf, running back, between parallel lines, to the right of way land of Morgan's * * * Railroad, * * * and also measuring 1,570 feet on the line which divides said Jared Y. Sanders [the vendor] from the Seeger & Nelson tract [being the tract No. 4, formerly owned by Bryant], and 1,704 feet on the opposite side line." Upon January 12, 1883, the property, as thus added to and subtracted from, was

sold by Bessie A. Wofford, administratrix, to John B. Lyons, as "that certain sugar plantation, fronting on Bayou Bœuf, in the parish of St. Mary, containing 1,200 arpents, more or less, bounded above by the lands of Mr. James N. Wofford [marked "Pharr" on the sketch], below, in part, by Morgan's Louisiana & Texas Railroad, and in part by the land of Martin and Ovilhard [lot No. 4 on the sketch], and in front by the said Bayou Bœuf."

On the 7th of May, 1900, the same property was sold by Lyons to the defendant Ditch as "that certain tract of land, or sugar plantation, known and designated as Inglewood Plantation, lying and being situated in the parish of St. Mary, Louisiana, containing a superficial area of about 1,500 arpents, bounded, above, or on the southeast, by land of Captain Pharr, formerly owned by Mrs. J. N. Wofford, in front, or on the south, by Bayou Bœuf, below, or on the west, by land of the Ramos Lumber Company, Limited, formerly of Seeger & Nelson, in part, and, in part, by Morgan's Louisiana & Texas Railroad & Steamship Company; said tract having a front of thirty-two arpents on Bayou Bœuf by the usual depth of about 40 arpents, being the same property acquired by the present vendor from the estate of Jared Y. Sanders by virtue of an act of sale, dated Jan'y 12th, 1883."

Concerning the warranty of title, this act contains the following recital:

"To have and to hold, free from any liens, mortgages or encumbrances, whatever, without any warranty on the part of the vendor. The said vendor, however, transfers all such actions of warranty as he has acquired to said property, and none other, and hereby warrants the said titles as against all persons claiming by, through, or under him, and as against all of his acts, and as against none other. And the refusal of the vendor to give a general warranty of title shall not be considered as casting a shadow upon the title of this property, the said vendor merely declining to warrant said title on account of his being a nonresident, and said purchaser accepting this restricted warranty simply because the title appears to be absolutely clear and, in fee simple, vested in the present vendor, on the records of the parish."

The Bryant tract had also, in the mean-while, passed through several hands. And among others who acquired were Sanders and Daniels, who also acquired the tract marked "No. 2" on the Sketch B, which had been sold to Stansbury. The "Sanders" referred to is the plaintiff in this case; and in November, 1867, he made a dation en paiement to his wife of his interest in the property, describing it as follows:

"The one undivided half interest and ownership of that portion, or tract, of land, lying and being situated in the parish of St. Mary, Louisiana, fronting on the north side of Bayou Bœuf nineteen arpents and running back 40 arpents, more or less, the front of nineteen arpents including Bayou Ramos; and, also, a triangular piece of land, fronting also on Bayou Bœuf and running back until it reaches Bayou Ramos, containing 74.92 acres, the said tract of land heretofore owned by the planting copartnership of Sanders & Daniels, who cultivated the same as a sugar plantation, and is bounded, in front by the Bayou Bœuf, above by the lands belonging to the estate of J. Y. Sanders, deceased, and sons, and below by the lands belonging to the estate of Mrs. Mary Stansbury, deceased, and the said undivided half thereof, belonging to the said appearer, he hereby transfers to his said wife," etc.

Upon the same day, and by the same description, the transferee, Mrs. Sanders, sold to Nelson & Seeger, from whom, by mesne conveyance, the property was afterwards acquired by the Ramos Lumber Company, Limited, the present owner. The evidence is conclusive to the effect that when, in 1849, Bryant and J. Y. Sanders, the plaintiff's father, bought the contiguous tracts, designated as 4 and 5 on the Sketch B, they, with the aid of a surveyor, established as the boundary between them the line "C, J," running N., 58° 30' E., and forming a right angle with the course of the bayou, and that the line thus established is well defined to this day by a ditch, an old fence, now grown up with trees, and the marks of three distinct surveys. It is also shown, without contradiction or attempt at contradiction, that for more than 50 years the Bryant tract has been cultivated by its owners, as far in the direction of the swamp as it is cultivated at all, along the line referred to; that the cane rows and ditches are laid off with reference

to that line .as a boundary, and that they were so laid off when the defendant examined the property before purchasing the Inglewood Plantation; that there are no indications whatever that the line "C, X, R," which the defendant now insists is the boundary between Inglewood and the Bryant tract, was ever established as a boundary, and that, as projected, it runs diagonally across the cane rows and ditches of the Bryant tract, and would so shift the side lines of that tract that upon the downstream side it would run off from the bayou at an angle of 45 degrees, whilst Inglewood Plantation, described in defendants' title as having "a front of thirty arpents on Bayou Bœuf by the usual depth of about forty arpents," would have the southern side line running N., 58° 30′ E., and the northern line running N., 13° 30′ E., and, instead of having the 1,200 arpents, more or less, as described in the deed to plaintiff's vendor, would contain 1,748.80 arpents, or 548.80 more than Lyons had ever bought, and more than he was willing to sell with warranty of title. There has been no attempt on the part of defendant to show that any prior owner of the tract No. 5 (now part of the Inglewood Plantation) ever pretended that the limits of that tract extended farther down the bayou than the line C, S, J, and it is shown affirmatively and conclusively that every one who has lived on either during the last 50 years, down to and including the occupant whom the defendant found at Inglewood when he bought the place, has recognized that line as the boundary between the tracts 4 and 5, as indicated on the Sketch B. It also appears that Wm. C. C. Martin could not have sold the tract B, D, H, J, K, L, with the lower side line running N., 13° 30′ E., since in that case it would have been necessary to have shifted the end of the line D, W, X, H, to a point about midway between F and G, thus cutting off the southeastern end of the tract No. 2, at that time the property of Stansbury, who acquired it February 2, 1848, whilst Alonzo Sanders acquired the larger tract nine days later. A further fact to be noted in this connection is that when, in October, 1874, J. Y. Sanders, who was then the owner of record, conveyed to Charles Morgan the 15-acre tract from the northwest corner of Inglewood Plantation,

he described it as "measuring 417.5 on Bayou Bœuf, running back, between parallel lines, * * * also measuring 1,574 feet on the line which divides said Jared Y. Sanders from the Seeger & Nelson tract," etc.

The Seeger & Nelson tract and Bryant tract and the tract No. 4, it will be remembered, are one and the same, from which it follows that if its southern boundary constitutes the northern boundary of the tract sold to Morgan, and if the line runs N., 13° 30′ E., as the defendant now asserts, the Morgan tract should lie along the line C, R, forming an angle, with the course of the bayou, of 45 degrees, whereas, in point of fact, it lies at a right angle with the bayou, and has a protection levee running from the bayou back to the railroad embankment, at its rear end, and serving as the boundary between it and Inglewood Plantation, from which it was taken. And the Morgan tract, with the Seeger and Nelson tract, forms the lower, or northwestern, boundary of Inglewood Plantation, according to the title under which the defendant holds.

Upon the other branch of the case, it appears from the evidence that Robert W. Cocke is the plaintiff's nephew; that he was appointed deputy sheriff March 1, 1901; and that shortly afterwards (probably in April) an arrangement was made between him and the plaintiff to the effect that he (Cocke) should look up the heirs of Martin, and buy from them the land of which a portion is now in controversy, the plaintiff to furnish the money, and the profits to be, in some way, divided; the position insisted on by the plaintiff being that Cocke was his agent in the matter. It cannot be doubted that Cocke knew that the defendant, or some one else, was "pulling" timber from the land, and that he had reasons for believing, and did believe, that a lawsuit would be necessary for the vindication of the title to be acquired by him. There was, however, no lawsuit pending when he acquired the title, or when he conveyed it to the plaintiff, though there was an understanding between the plaintiff and Cocke, upon the one hand, and Boru O'Brien and J. B. Sanders, sheriff of the parish, on the other, to which the plaintiff was a party, and which was reduced to writing after the filing of this suit, to the effect that O'Brien and J. B. Sanders are to

have three-fourths of the timber from the lands here claimed, in the event of its recovery, at the price of $2 a thousand feet.

## Opinion.

It will be seen from the foregoing statement that, as between the plaintiff and defendant, the only land in controversy is that embraced within the triangle R, H, X, but, if the defendant's lower boundary is established upon the line C, X, R, it would follow that the upper boundary of the tract No. 4, owned by the Ramos Lumber Company, must be established upon the same line; and, as the lower boundary of that tract would have to be shifted to correspond, the tract would overlap that claimed by the plaintiff, save as to so much of the latter as lies N., 13° 30' E., of the tract No. 2, the title to which calls for no land behind Bayou Ramos.

The defendant's immediate author acquired by a title which called for 1,200 arpents, more or less, and described the property as "bounded, above, by the land of Mrs. Jane N. Wofford [now Pharr], below, in part, by Morgan's Railroad and, in part, by the land of Martin & Ovilhard [Ovilhard should be Dreibholz, and the description refers to the Ramos Lumber Company tract, No. 4] and, in front, by the said Bayou Bœuf." He had owned the place for 17 years, and it does not appear that he had ever pretended that its lower boundary was other than the line U, T, S, J, as indicated on the Sketch B, and as referred to in the title by which he sold. Nor had any one before him ever so pretended. When, therefore, he was called on to execute an act of sale of the same property, which called for "about 1,500 arpents," and which, according to the defendants' pretensions, calls for 1,748.80 arpents, he was naturally unwilling to warrant the title; and through the diaphanous excuse of nonresidence, given by him for that unwillingness, it is easy to see a good reason (i. e., that he did not believe that his title called for that much land), for, be it observed, upon March 22, 1880, by an act in which he declared himself a resident of Chicago, he had sold the identical property, "with full and general warranty of title," to J. Y. Sanders.

The title by which the defendant acquired described the plantation as containing about 1,500 arpents, bounded above by Pharr, on the south by Bayou Bœuf, below by "land of the Ramos Lumber Company, Limited, formerly of Seeger & Nelson, in part, and, in part, by Morgan's * * * Railroad and Steamship Company; said tract having a front of 32 arpents on Bayou Bœuf by the usual depth of about forty arpents." It is not disputed that the upper boundary A, O, runs back N., 58° 30' E., at a right angle, from the bayou; but the defendant, whose title calls for a front of 32 arpents, "by the usual depth of about forty arpents," pretends that his lower boundary runs N., 13° 30' E., at an angle of 45 degrees, from the bayou, and thereby takes in 548.80 arpents more land than the title of his vendor called for. This proposition, taken by itself, finds no support in either reason or authority. The property is a plantation having 32 arpents front on a running stream, "by the usual depth of 40 arpents." One of the side lines was long ago established as forming a right angle with the stream, and, if the world were wholly unoccupied on the other side, there is no reason why the defendant should be permitted to extend the other side line at a different angle and to a greater length, and thereby nearly double the width of his property in the rear, and increase the acreage by more than 50 per cent. But the world on the other side is not unoccupied. The defendant's title gives the railroad property and the land of the Ramos Lumber Company as his lower boundary. It is shown that the side lines of the railroad property were established in 1874, and that they run N., 58° 30' E., from which it follows that, according to the defendant's title, his lower line, at least to the depth of that property, must run N., 58° 30' E. It is also shown by the title that the lower side line of the railroad property is the boundary between it and the property of the Ramos Lumber Company, from which it also follows that the line constituting the upper boundary of the latter property must also run N., 58° 30' E., so that the entire line constituting the lower boundary of the defendant's property, as called for by his title, must run N., 58° 30' E., and not N., 13° 30' E., as asserted by him. And this being the case, it would be immaterial whether the upper

boundaries of the railroad tract and the Ramos Lumber Company tract were correctly established or not, since they were established to the satisfaction of those who had the right to establish them, the one more than 50, and the other nearly 30, years ago; and, as so established, they have been maintained ever since, publicly, openly, and to the knowledge of every one who might concern himself with the matter. And the defendant bought Inglewood Plantation according to the boundaries thus established, which his title declares to be its lower boundary.

Beyond this, there is not the slightest reason to suppose that any error was committed in the establishment of the boundaries in question. There is no reason why a proprietor owning a large body of land fronting on a stream should sell it in tracts forming acute and obtuse angles with the stream; nor is there any reason why a person should prefer to buy property so laid off. Wm. C. C. C. Martin sold the tract No. 2 to Stansbury before he sold the tract No. 3 to Sanders, and he could not have intended that the lower line of the latter tract should run N., 13° 30' E., because it would in that case have extended through the property already sold to Stansbury. But if he had not sold to Stansbury, and if it had been possible for him to have conveyed to Sanders, with the frontage on the bayou called for by the latter's title, back lands extending off at an angle of 45 degrees, why should he have done so, when he owned lands of the same kind lying immediately behind the front land so called for? This matter has been dealt with in the past by several surveyors and courts, and the conclusion, with the exception, possibly, of that arrived at many years ago by one surveyor, has always been the same, i. e., that the side lines of the different tracts run at right angles with the bayou. The defendant examined the records and the maps in which those conclusions have been announced; he has lived in the parish of St. Mary all of his life; and, if he did not know what is here stated, it was because he did not choose to know it. Nevertheless he proceeded to appropriate timber, not only from land that was not included in his purchase from Lyons, but from land which was not so included according to his own theory; the evidence showing

that he has deadened, if he has not "pulled," timber from the tract lying to the westward of the line C, X, R, which he asserts is the property of the Ramos Lumber Company.

Our conclusion, then, is that, whether the title of the plaintiff be recognized or not, the defendant Ditch is a mere trespasser and depredator on the land here claimed, and hence that he would in no event be entitled to recover the damages alleged to have been sustained by reason of his having been enjoined from "pulling" timber therefrom.

The defendants' counsel refer to the description contained in the dation en paiement from the defendant to his wife, and assert that it operates in some way as an estoppel. We are unable to discover how it can have that effect. Plaintiff and his partner, Daniels, owned in indivision the tracts Nos. 2 and 4. Even according to the defendants' theory of the case, the heirs of Martin still owned the lands extending from Bayou Ramos N., 13° 30' E.; hence the description given in the dation en paiement of the tract No. 4 as "bounded below by the lands of Mrs. Mary Stansbury, deceased," was a palpable error, and no more suggests the idea that the plaintiff considered that the lower side line of the tract No. 4 ran N., 13° 30' E., than that it ran N., 58° 30' E.

The counsel seem also to attach some importance to a disclaimer of title executed by the plaintiff, with respect to Inglewood Plantation, after the sale by Lyons to the defendant. It appears that the plaintiff, who had once owned an undivided one-sixth interest in that plantation, had gone into bankruptcy, and Lyons and the defendant were unable to find how, when, or to whom that interest had been disposed of. The plaintiff therefore signed an instrument, in the nature of a quitclaim, with reference to it. This was done, apparently, as a matter of accommodation; and it does not appear, and is not at all probable, that he had at that time seen the act of sale from Lyons to the defendant, or that he was aware that the defendant contemplated setting up the pretensions as to boundaries and acreage which are here asserted.

The remaining question is, has the plaintiff a title which should be sustained in a court of justice? The purchase of a litigious right is, at worst, malum prohibitum, rather

than malum in se. In other words, the purchase by one person of rights which another may seek, or is actually seeking, to enforce by means of a lawsuit, does not of necessity involve either immorality or dishonesty, or turpitude of any kind. On the contrary, it might happen that a person unable, for one reason or another, to prosecute a just claim, would in that way be enabled to realize something, whereas, if left to himself, he would get nothing. If, therefore, ordinarily speaking, such a transaction is wrong, it is wrong merely because it is forbidden by law as a matter of public policy. There have been, and probably are, tracts of land in this country which are occupied by squatters, who can be removed only by legal process; grazing lands, the enjoyment of which has been and still is so interfered with by trespassers, rustlers, wire cutters, and such like, that it could be secured to the owners only by judicial proceedings or brute force; or, to make the illustration more pointed, there are, no doubt, cypress swamps and pine forests upon which depredations are being committed, under or without color of title, by persons who would resist to the utmost the efforts of the owner to interfere with their operations. The owner of such property may or may not be able, or he may or may not be disposed, to institute and maintain a lawsuit for the protection of his rights; but, if he be not able or if he be not willing to embark in such litigation, he ought not for either of those reasons to be denied the right to sell the property. And yet, if it be the law that the purchaser can acquire no title that the courts will maintain, it is plain that the owner is denied the right to sell. And no law should be given that effect, unless the language is so plain as to leave no alternative. In fact, it may be doubted whether it would be competent legislation, no matter how plain its language.

The statute law of this state upon the subject of what are called "litigious rights" is embraced within the following articles of the Code, to wit:

"Art. 2652. He against whom a litigious right has been transferred, may get himself released by paying to the transferee the real price of the transfer, together with the interest from its date.

"Art. 2653. A right is said to be litigious whenever there exists a suit and contestation on the same."

"Art. 2447. Public officers, connected with courts of justice, such as judges, advocates, attorneys, clerks and sheriffs, cannot purchase litigious rights which fall under the jurisdiction of the tribunal under which they exercise their functions, under pain of nullity and of having to defray all costs, damages and interest."

"Art. 3556. Whenever the terms of law employed in this Code have not been particularly defined, they shall be understood as follows:

*　　*　　*　　*　　*　　*

"Litigious Rights. Litigious rights are those which cannot be exercised without undergoing a lawsuit."

Article 3556 is devoted exclusively to definitions, and, ex vi terminorum, applies only to cases where "the terms of law employed in this Code have not been particularly defined." But the term "litigious right" is particularly defined in the body of the Code. "A right is said to be litigious whenever there exists a suit or contestation on the same." And the penalty imposed upon the ordinary citizen, and that imposed upon the officers connected with the courts of justice, who purchase litigious rights, differs in this: that in the one case "he against whom a litigious right has been transferred may get himself released by paying to the transferee the real price of the transfer, together with the interest from its date," whilst in the other case the purchase is made "under pain of nullity and of having to defray all costs, damages and interest." These are plain propositions, and they are sustained by the jurisprudence of this court.

In Prévost's Heirs v. Johnson et al., 9 Mart. (O. S.) 123, the plaintiff claimed a tract of land, of which the defendants were in possession, and it was objected that the action was predicated upon the purchase of litigious rights. The court, speaking through Judge Martin, said:

"The right purchased by the defendant is said to be a litigious right, although no suit was ever instituted for the recovery of the premises. In the case of Morgan v. Livingston et al., 6 Mart. (O. S.) 11, the defendants resisted the plaintiffs' claim on the ground that he had purchased a litigious right; hav-

ing purchased from P. Bailey a lot on the batture, which was at the time of the purchase claimed by the defendants, who were in possession of it. This court decided that the vendor's was not a litigious right. Yet in few cases could it be more obvious that the defendants would not give up without some legal struggle. We cited no authority, being of opinion that the expressions of the statute were too plain to admit of a doubt. We are not left to ascertain the meaning of the expression 'litigious right' by a reference either to the opinions of the commentators or to the decisions of the courts. The law has expressly given us its meaning: 'A right is said to be litigious whenever there exists a suit and contestation on the same.' Civ. Code, 361, art. 131. It seems that a suit brought does not alone suffice; that it is not enough that there should be a petition; that a copy of it and a citation should be served on the defendant. It is necessary that there should be an answer. Perhaps any plea will suffice. Now, if the advance and progress of the suit to the contestation be essential, how can it be held that the inception of the suit is unnecessary? If authorities be wanted on so plain a point, we refer the student to the commentary of Gregorio Lopez on the Part. 3, 7, 13, who observes that it had been doubted whether the thing be litigious before the service of the petition, and he concludes that it is not so; that it was not before the Partida, and it has introduced no change. Febrero de Escr. ch. 7, n. 9. It was so in Rome. 'Litigiosa res est de cujus dominii causa movetur inter possessorem, judiciaria conventione, vel principi precibus oblatis et judici insinuatis et pereum futuro reo cognitis.' C. 8, 37, 1. Auth Litigiosa Nov. 112, c. 1.

"The French text of our Code Civil is a literal copy of article 1700 of the Code Napoleon; and in the case of Delaunai v. Delanci, the Court of Appeals, in affirming the judgment of the tribunal of Rouen, observed that it was improper to confound a thing liable to litigation with a litigious one. 11 Jur. Code Civil, 451. When the thing ceded is not contested, and is not the subject of a suit, at the time of the cession, the thing is not litigious. 13 Id. 49; 13, Pand. Fr. n. 119. We conclude that, as there was no suit instituted in the present case at the time that the defendants purchased the right of Hebert's heirs, they did not purchase a litigious one."

In Consolidated Association v. Comeau et al., 3 La. Ann. 552, it appeared that, pending an action by a subrogee against the heirs of the mortgagor to enforce his claim against the mortgaged property, and against the heirs personally, the attorneys who had appeared for the defendants purchased a portion of the mortgaged property, and intervened in the suit. It was contended that the purchase was in violation of the articles of the Code which have been quoted. The court, through Mr. Justice Slidell, referring to the interveners, said: "The naked title, they had the right to buy; but so far as the question of incumbrance was involved, and so far as they avail themselves of their purchase to resist the claim of the plaintiffs, the purchase is a nullity, and can confer no rights."

In Pearson v. Grice, 6 La. Ann. 232, the court, through Mr. Justice Rost, said:

"The only question presenting any difficulty in this case, and the only one in which we differ from Mr. Justice Preston, is whether the intervener, who is the sister of the half blood of the father of the deceased, is entitled to share her succession equally with the plaintiff, who is a sister of the whole blood of the mother of said deceased." Another question considered by Mr. Justice Preston, as to which the court agreed with him, was that concerning litigious rights, and upon that subject he said (page 237): "It is true that the last article of our Code, in defining the terms used in the Code, declares that litigious rights are those which cannot be exercised without undergoing a lawsuit. The impossibility of exercising the right without undergoing a lawsuit is never certainly ascertained until the lawsuit is commenced. Before its commencement, it is to be supposed that, if the claim be just, the person against whom it is made will do justice by according it to the claimant without suit, or that he will at least arbitrate or compromise the matter, and that the claimant will not be forced to a lawsuit. It is only when forced to commence a lawsuit that it is ascertained that the claim cannot be exercised without undergoing a lawsuit, and it becomes a litigious right by the commencement and existence of the lawsuit.

\* \* \* This court has uniformly refused to avoid the sale of a thing on the ground that it was a litigious right, unless suit had been brought to enforce the right at the time of the sale. Denton v. Willcox, 2 La. Ann. 60; Marshall v. McCrea, Id. 79; Consolidated Ass'n v. Comeau, 3 La. Ann. 554."

The doctrine in these cases is affirmed in McDougall v. Monlezun et al., 38 La. Ann. 223; and in Bonner & Bonner v. Beard, 43 La. Ann. 1040, 10 South. 373, Mr. Justice Breaux, as the organ of the court, said: "Article 2653, Rev. Civ. Code, in terms, defines a litigious right as was held in the quoted case [McDougall v. Monlezun, supra]. We discover no reason to supplement this definition, given in article 2653, Civ. Code, by reference to that contained in article 3556, Rev. Civ. Code."

These authorities, we think, correctly interpret the law. As to the cases upon which the counsel for the defendant seem mainly to rely, it is only necessary that we should quote the syllabus in each, to show that the issues presented for decision were essentially different from those which are here to be determined:

"One who purchases a claim which he knows to be in suit and legally contested is entitled to recover on it only what he has paid for it, with legal interest from the date of its transfer to him." Spears v. Jackson, 30 La. Ann. 523.

"The sale of plaintiffs' interest in the land sued for in a petitory action, for a fixed price and without warranty, is the sale of a litigious right; and, the vendee being the sheriff of the court in which the suit is pending, such sale is null and void. The fact that the suit is still carried on, after the transaction, in the name of the original plaintiffs, does not prevent the nullity." Duson, Curator, et al., v. Dupre et al., 33 La. Ann. 1131.

We therefore conclude that the plaintiff acquired a valid title to the property claimed herein, and that, whatever may be said of the sale by him, after the filing of this suit, to O'Brien and Sanders, of the timber on the land, he should have judgment in this suit, maintaining that title.

Upon that question, as also upon the question of damages, we find no error in the judgment appealed from, and the same is accordingly affirmed.