The motion is based on the following article (889) of the Code of Practice, to wit:

"But if the appellee, on the appeal of the other party, neglect to pray that the judgment be reversed on those points which are prejudicial to him, he shall not afterwards be allowed to appeal, but the judgment shall remain irrevocable for or against him."

Clearly, under this article, after a case has passed out of the trial court and gone to the appellate court, the remedy of the appellee is by answer to the appeal, and not by a second appeal.

It is well settled that, as a general rule, after a case has passed to the appellate court, the trial court cannot make any order in it as between appellant and appellee. State ex rel. Gill v. Tissot, 34 La. Ann. 91; Carey v. Richardson, 32 La. Ann. 1170; State ex rel. Irwin v. Judge, 36 La. Ann. 192; State ex rel. Cientat v. Judge, 32 La. Ann. 815; Succession of Pomeroy, 22 La. Ann. 518. Aliter, as between appellees. Levy v. Collins, 32 La. Ann. 1004.

Appeal dismissed, at cost of appellant.

---

· (42 South. 158.)

No. 15,445.

RAMOS LUMBER & MFG. CO., Limited, v. SANDERS et al.

(June 18, 1906. Rehearing Denied Oct. 29, 1906.)

1. DEEDS — CONSTRUCTION — PROPERTY CONVEYED.
In a sale of a tract of land, described as having so many arpents front by so many in depth, the side lines will be presumed to run parallel with each other and to form right angles with the front lines, unless there are controlling words or circumstances to the contrary, and this presumption is stronger as to one of the side lines, when it is admitted or proved that the other side line falls perpendicularly upon, and forms a right angle with, the front line.

2. ADVERSE POSSESSION — PRESCRIPTION OF TEN YEARS.
To maintain the plea of the prescription of 10 years, acquirendi causa, there must be actual possession, in good faith, during that period, under a title translative of property.

[Ed. Note.—For cases in point, see vol. 1, Cent. Dig. Adverse Possession, §§ 65, 66, 161, 387.].

3. SAME—PRESCRIPTION OF THIRTY YEARS.
To maintain the plea of the prescription of 30 years, acquirendi causa, there must be corporeal possession in the beginning, which must be continued, or else the possession must be preserved during the entire period by external and public signs announcing such possession and the intention to possess, and this rule applies with equal force to swamp as to other lands.

[Ed. Note.—For cases in point, see vol. 1, Cent. Dig. Adverse Possession, §§ 124, 125, 226–231.]

(Syllabus by the Court.)

Appeal from Twenty-Third Judicial District Court, Parish of St. Mary; Albert Campbell Allen, Judge.

Action by the Ramos Lumber & Manufacturing Company, Limited, against Henry J. Sanders and others. Judgment for plaintiff, and defendants appeal. Reversed and suit dismissed.

Foster, Milling, Godchaux & Sanders, for appellants. Don Caffery & Son and Beattie & Beattie, for appellee.

### Statement.

MONROE, J. Plaintiff alleges ownership and possession, for more than 30 years, of a certain tract of land in the parish of St. Mary, said to have been acquired (through mesne conveyances which are set forth in the petition) from W. C. C. C. Martin, who acquired from Robert Martin, who acquired from the governments of Spain and the United States, and it prays that the defendants be condemned in damages and that its "right and title to the possession and ownership of said land be recognized as valid and good, and that * * * the said parties defendant be perpetually enjoined from slandering the title of petitioner and from laying any claim to the said land, or any portion thereof."

The parties originally named as defendants were H. J. Sanders, W. O. Ditch, and Jos. Norgress. After the suit had been pending for some time Sanders filed an answer, alleging that he is the bona fide owner, in possession, of about 500 acres of land, which he describes, acquired, as he alleges, through mesne conveyances from the heirs of W. C. C. C. Martin; that plaintiff is estopped to claim said land (1) because, after his acquisition thereof in 1901, he called upon its officers to have the boundary established, and that a surveyor, employed for that purpose, established, as the boundary between it and the land of the plaintiff, the line D W X H, as indicated on the sketch B, made part of the opinion of the Supreme Court in the case of Sanders v. Ditch et al., 110 La. 887, 34 South. 860, which boundary was accepted by plaintiff, who paid one-half of the cost of said survey, and (2) because, after said survey had been made, defendant found it necessary to engage in a protracted and expensive litigation with W. O. Ditch and Joseph Norgress (his present codefendant) to prevent them from trespassing on said land, during which it was shown that they had been for some time pulling timber therefrom, to the knowledge of, and without objection from, plaintiff; and that plaintiff allowed defendant to bear the burden of said litigation and to prosecute the same to final judgment without appearing therein to assert any right or claim. The other defendants herein, Ditch and Norgress, made no appearance, and as to them, matters remained in abeyance from the filing of the suit, in April, 1902, until March, 1903, when, the case having proceeded to the argument, as to the defendant Sanders, the plaintiff's counsel suggested to the court that, by reason of the fact that a final judgment had been rendered in the case of Sanders v. Ditch et al., there was no longer any issue between the plaintiff and said parties, and moved that the counsel who had represented them in said case be entered as counsel of record for the plaintiff in the instant case, which was done. Ditch and Norgress are therefore eliminated from this litigation.

In order to render more intelligible the further statement of the case, we shall refer to the subjoined sketch A, which, though prepared without pretension to scale measurement, shows with sufficient accuracy for present purposes the object in dispute; the land claimed by the litigants, respectively, being indicated as "Tract A," and the line M N, on the said sketch, corresponding with the line D W X H, as indicated on the sketch B, used in the case of Sanders v. Ditch et al.

Bearing in mind that, unless otherwise specified, the tracts, lots, lines, etc., as hereinafter referred to, relate to those indicated on the sketch A, it appears that upon January 22, 1848, W. C. C. C. Martin, under whom both litigants assert title, sold to John Dooley the tract D, described as beginning at a certain point on Bayou Boeuf and extending down the bayou for 20 arpents, "with the ordinary depth of 40 arpents," and that upon the same day he sold to Dr. Tarleton a tract commencing at the upper line of the Dooley tract, running up the bayou 30 arpents to the line of the vendor, with the ordinary depth of 40 arpents. It will be noted, in this connection and hereafter, that the expressions "upper line" and "lower line" refer to the course of the bayou, and that, as the bayou runs in a northwesterly direction, the upper line, considered with reference to the course of the bayou, is the lower line, considered with reference to the points of the compass, and vice versa. In 1851 Dooley sold tract D to Wofford, and in 1857 Dr. Tarleton brought an action in boundary against Wofford, in which it was determined that the line between their respective tracts ran N. 58° 30' E., forming, approximately, a right angle with the bayou. The Dooley tract was subsequently divided into two

Sketch A.

tracts, having each 10 arpents front on the bayou, and the upper tract was merged into that which had been acquired by Tarleton, whilst the lower tract was merged into what afterwards became, and is now, Inglewood Plantation, indicated on sketch A as "Tract C–D." Shortly after the sales to Tarleton and Dooley, to wit, in February, 1848, Martin sold to Edwin Stansbury Tract E, including the triangle F but not including the triangle G, describing the same as:

"A certain tract, or piece, of land, situated on Bayou Boeuf * * * at the mouth of the Bayou Ramos, fronting seven arpents, more or less on the Northern side of the Bayou Boeuf, bounded, below, by the lands of the vendee, and above, by the Bayou Ramos, being a triangular fraction of a certain tract of land known as No. 33," etc.

On February 11, 1848, Martin sold to Alonzo Sanders tract B–C, described as:

"A certain tract * * * lying * * * on the North East side of Bayou Boeuf, beginning on the lower line of John Dooley and running down said Bayou front 41 arpents to the lower, or West, bank of the Bayou Ramos, with a depth of 40 arpents, containing the quantity of 1640 arpents, more or less."

In April, 1849, Alonzo Sanders, represented by his brother, H. J. Sanders (the present defendant), sold to John A. Bryant tract B, described as a tract of land on the north side of Bayou Boeuf, "with a front of 19 arpents and a depth of 40 arpents, the front of 19 arpents including the Bayou Ramos, bounded, below, by the lands of Edwin Stansbury and lands of W. C. C. Martin, and, above, by the lands of Alonzo Sanders, the present vendor." And, on the same day Alonzo Sanders sold to J. Y. Sanders tract C, described as a tract on the north side of Bayou Boeuf, "with a front of 25.50 arpents, more or less, bounded, below, by the land of John A. Bryant, and above, by the land owned by John Dooley." Tract C, then, passed through different hands, and the lower half of the Dooley tract being added, and the little tract indicated on sketch A by the let-

ters "R R Co" being subtracted, formed Inglewood Plantation, the lower line of which was held, in the case of Sanders v. Ditch et al., supra, to run N. 58° 30′ E., parallel with what had been the lower line of the Dooley tract.

Tract B was sold in 1853 (according to the description already given) by John A. Bryant to Charles B. Bayliss, and in 1856 was sold, under execution against Bayliss, to the present defendant. In the same year the defendant sold an undivided half interest in said tract to D. C. Daniels, describing the same as containing 19 arpents front on the east side of Bayou Boeuf, including the Bayou Ramos, by the usual depth of 40 arpents, bounded below by the lands of E. Stansbury and W. C. C. C. Martin "and above by the lands of J. Y. Sanders." In the same year, also, Mrs. Mary (widow Edwin) Stansbury sold to Sanders and Daniels tract E, including the triangle G, but not including the triangle F, describing the same as:

"That certain tract * * * having a front of ten acres on the right Bank of the Bayou Boeuf, commencing on the right bank of the Bayou Ramos, thence around to the starting point, 21 acres, more or less, containing, in all, an area of 74.92 acres, according to the survey of A. L. Fields," etc.

In this connection, it is shown that the difference between the description by which Edwin Stansbury acquired and that by which his widow sold arose from the fact that the property was acquired as bounded, on the west, by the land of the Martin concession, whereas it was sold as bounded on the west by the line H J, as indicated on the sketch A. The two tracts, B and E, as thus acquired, were thereafter used by Sanders & Daniels, so far as the land was available for that purpose, as a sugar plantation, until November 19, 1868, when Sanders made a dation en paiement to his wife of his half interest therein, describing the property as:

"That certain tract, or tracts, * * * fronting on the North side of Bayou Boeuf 19 ar-

pents, more or less, and running back 40 arpents, more or less, the front of 19 arpents including the Bayou Ramos, and also a triangular piece of land, fronting also on the Bayou Boeuf and running back until it reaches Bayou Ramos, and containing 74.90 acres, the said tracts of land heretofore owned by the planting partnership of Sanders & Daniels, who cultivated the same as a sugar plantation, and is bounded, in front, by the Bayou Boeuf, above, by the lands belonging to the estate of J. Y. Sanders, deceased, and sons, and below by lands belonging to the estate of Mrs. Mary Stansbury, deceased."

Upon the same day (November 19, 1857) Mrs. Sanders sold the property, as acquired by her, to Nelson & Seger, who upon January 14, 1868, acquired the undivided half interest therein of D. C. Daniels; and Nelson & Seger used the two tracts as a sugar plantation until May, 1881, when Seger sold his half interest therein to Francis Martin, who in August, 1883, acquired the remaining half interest from the widow of Nelson, and thereafter, by mesne conveyances, transferred the entire property to the plaintiff company, of which he is a member.

It further appears that Sophie Martin, executrix of W. C. C. C. Martin, sued J. Y. Sanders for the balance of the purchase price of tract C; that Sanders defended on the ground that the tract was not fully 40 arpents in depth; that, the defense being sustained by a survey, the shortage was fixed and diminution of the price allowed; and that subsequently, Walter Brashear having sued Sanders & Daniels, claiming the two tracts (I: and E) mentioned as having been acquired by them, a survey was made by order of court, and Cornay, parish surveyor, established the boundaries of those tracts as they are indicated on sketch A; i. e., the lower line of tract B as running N. 58° 30' E., and the tract E as included within the Bayou Boeuf and Ramos and the line H J. When the defendant, in 1901, bought tract A, being the land in dispute, from Robert R. Cocke (who had purchased from

the heirs of W. C. C. C. Martin), he found that W. O. Ditch and Jos. Norgress were pulling timber upon the one side or the other, or upon both sides, of the line constituting the boundary between that tract and tract B, and he invited the representatives of the plaintiff to join him in having a survey made, in order that it might be ascertained whether the pulling was being done from the tract claimed by him or from tract B, of which plaintiff is the conceded owner, and the survey was accordingly made, the line between the two tracts was established as indicated by the letters M N (on sketch A), and the expense of the survey was divided between the plaintiff and the defendant. Thereafter the defendant brought suit against Ditch and Norgress to restrain them from pulling timber on his land, and, by way of defense, Ditch set up that the lower boundary of Inglewood Plantation, of which he was then owner, was the line O P (on sketch A), running parallel, not with the upper, or Dooley, line, but with the concession line (L R as on sketch A). This defense was not sustained, and there was judgment in favor of the plaintiff, decreeing him to be the owner of tract A and holding Ditch to be a trespasser in bad faith. The plaintiff, through its officers, knew that this suit was pending, but there was apparently an understanding of some kind between those officers and Ditch, since, although Ditch's contention that the lower line of the property was the line O P, necessarily involved a claim to the greater part of tract B, the plaintiff took no part in the suit, and arrived at an agreement with Ditch to the effect that the latter should not pull timber from tract B and should pay for what he had pulled, and plaintiff's officers went upon the land and indicated the line O P as the line to the south, or east of which Ditch was not to pull timber, making no objection, however, to his pulling to the north or west side of that

line, and making no claim against him for timber already pulled upon that side.

Some attempt has been made to sustain plaintiff's allegation, to the effect that, through itself and its authors, it has been in possession of the land in dispute for more than 30 years. The evidence adduced on that subject fails of its purpose. We find the land to have been, and to be, swamp land, uncultivated and unfit for cultivation, which was regarded as of little or no value, and of which, until Ditch in 1900 began pulling timber from it and the plaintiff herein brought suit against him, no one can be said to have been in possession. It was nearly two years after Ditch had begun his operations, and perhaps a year or more after the defendant had sued to oust him from possession, that the plaintiff brought this suit, which was never prosecuted against Ditch, and was not seriously prosecuted against any one until the litigation between the defendant and Ditch had terminated in a judgment in favor of the former. The plaintiff's allegation of possession at the time of the filing of this suit is therefore no better sustained than its allegation of possession prior to that time.

It appears from the evidence that, prior to the sale to Sanders & Daniels, Stansbury occupied as owner, not only the tract E (including the triangle F), which he had purchased from W. C. C. Martin, but that he (or his widow) also occupied the tract designated as "School Section 10," of which he was supposed to be the owner, and that he utilized the entire property as far back as the land was available for plantation purposes. He also owned the lot 7, beyond Bayou Ramos and to the westward of the concession line, but that lot, like the other land between Bayou Ramos and Lake Palourde, was part of a swamp, the ownership of a single lot in which was not likely to have been known or considered. It seems to have been ascertained at some later date that section 10, being school land, was not susceptible of private ownership, but that circumstance does not affect the fact that tract E might have been, and was, described as bounded below by Stansbury, upon the faith of his occupancy, and then supposed ownership, of that section. When his widow made the sale to Sanders and Daniels, it did not include the triangle F, which was part of the tract that Stansbury had purchased from Martin, and it did include the triangle G, which was, and is, part of school section 10, and plaintiff admits (through Dreibholtz, a member and officer) that the matter was rectified some 10 or 12 years ago by plaintiff's acquisition of the triangle F as an offset to its loss of the triangle G, though, as we understand it, plaintiff is now in possession, through a tenant (possibly as lessee of the school authorities), of the whole of section 10. It further appears that Nelson & Seger, as owners of tracts B and E, were assessed in 1876 upon 750 acres of land; that plaintiff's more immediate authors, as owners of said tracts, were assessed in 1881 upon 800 acres, in 1882 upon 800 acres, in 1883 (having apparently calculated the difference between acres and arpents), upon 710 acres, and thereafter, until 1888, upon 710 acres, after which the tracts were assessed for some years as containing 700 acres, and later still as containing 300 acres. It does not appear that they were ever supposed to contain more than 800 acres, which, as tract B measures 19x40, or 760 arpents, and tract E contains 74.92 acres, is not far from the correct assessment, whereas, if the lower line of tract B should be held to follow the meander of the Bayou Ramos, as plaintiff contends, the tract would contain nearly double that acreage. There was judgment in the district court in favor of the plaintiff, and the defendant has appealed.

The judge a quo says in his opinion:

"Alonzo Sanders sold to John A. Bryant the following portion of the land which he had purchased from W. C. C. C. Martin: 'A certain tract * * * on the Bayou Boeuf * * * on the North side of the said Bayou with a front of 19 arpents and the depth of 40 arpents, including the Bayou Ramos, bounded, below, by the lands of Edwin Stansbury and W. C. C. C. Martin, and, above, by the lands of Alonzo Sanders.' This is the land which, by reason of subsequent transfers and descriptions, gives rise to the controversy in this suit."

It is not asserted that the foregoing description is sufficient to have devested W. C. C. C. Martin of his title to the land in dispute, nor could such assertion reasonably be made, since the land sold by Alonzo Sanders to John A. Bryant is described as "bounded, below, by the lands of Edwin Stansbury and W. C. C. C. Martin," and the only land of W. C. C. C. Martin which could have served as such boundary is the land in dispute. The plaintiff therefore, conceding in his petition that W. C. C. C. Martin was the owner of the land in dispute, and setting up a written title alleged to have been derived, through mesne conveyances, from him, fails in its proof on that point, and obtains judgment against the vendee of Martin's heirs upon the basis, in part, of a title said to have been derived from one who did not own the land, and, in part, of the prescription acquirendi causa, which, it may be remarked, is not set up in the pleadings.

It is said that Henry J. Sanders, whose title to tract B is traced through Bayliss to the sale made by Alonzo Sanders to Bryant, and whose title to tract E is based on the sale made by Mrs. Stansbury to Sanders & Daniels, conveyed his interest in both tracts, by dation en paiement, to his wife, by a description which included, and intended to include, an interest in tract A, which he did not own. He testifies that he had no such intention. For the rest, the description to which the effect mentioned is attributed. reads as follows:

"That one undivided half interest and ownership of that certain tract, or tracts * * *· fronting on the North side of Bayou Boeuf, 19 arpents, more or less, and running back 40· arpents, including the Bayou Ramos; and, also, a triangular piece of land fronting, also, on Bayou Boeuf and running back until it reaches the Bayou Ramos and containing 74.92 acres, the said tracts of land were heretofore owned by the planting co-partnership of Sanders and· Daniels, who cultivated the same as a sugar plantation, and is bounded, in front, by the Bayou Boeuf, above, by the lands belonging to the estate of J. Y. Sanders deceased and sons, and below, by the land belonging to the estate of Mrs. Mary Stansbury, deceased."

It will be observed that the land which is· the subject of this dation en paiement is expressly declared to be that which had theretofore been owned by Sanders & Daniels, and which had been cultivated by them as a sugar plantation, which description is wholly inapplicable to tract A, since there is no pretense that Sanders & Daniels had ever owned that tract, or that they, or any one· else, had ever cultivated it as a sugar plantation, or could have done so. It is said, however, that the language "bounded * * *, below, by land belonging to the estate of Mrs. Mary Stansbury, deceased," gives as a boundary, not only the triangle I J K, forming part of the tract E, which Stansbury had acquired from Martin, and the section 10, which, together with the triangle mentioned, constituted the Stansbury plantation and home, but that it also includes, as bounding the land sold, the lot 7, which lies in the swamp between Bayou Ramos and Lake Palourde, and hence that the conveyance includes the whole of the tract A, containing 640 arpents of swamp land, to which the donor had no· title, and pretended to have none, and which at that time was considered of little or no value; in fact, of so little value that the lots 3· and 6, which lie immediately to the north of lot 7, were purchased from the state 30 years later at the price of swamp land, and those lots, it is proper to say, are contiguous·

to the line of the Martin concession, and constitute, in much greater proportion than lot 7, the boundary upon that side of tract A. Beyond this, it must be remembered that the dation en paiement conveyed one plantation, consisting of two tracts. The upper of those tracts is that which had been conveyed by Alonzo Sanders to John A. Bryant, and which, in the dation en paiement, as well as in the prior conveyances, is described as "fronting on the North side of Bayou Boeuf 19 arpents, more or less, and running back 40 arpents, more or less." Running back how? It is proved and admitted that the upper line of the tract (line P S on sketch A) forms approximately a right angle with Bayou Boeuf, and runs N. 58° 30' E., and that the tract B–C, of which tract B forms part, was sold as having a frontage of 41 arpents, by a depth of 40 arpents, containing 1,640 arpents, more or less, and as, 41×40=1,640, and equals nothing else, and means, in a matter of this kind, a parallelogram, and nothing else, it follows that the lower line of tract B must be parallel with the upper line. It is true that it turned out that tract C did not have the required depth, and that a former vendee obtained a diminution of the price, but the side lines, nevertheless, remained parallel with each other; otherwise the lower line might be extended in any direction from N. 1' E. to N. 58° 30' E., and this, according to the theory of the plaintiff, whether the vendor owned property within those points of the compass or not. This court passed on the question thus presented in Sanders v. Ditch et al., supra, but it had been decided long before. Thus in Bourguignon v. Boudousquie, 6 Mart. (N. S.) 697, it was said:

"On a sale of a tract of so many arpents in front, with the usual depth, the side lines will be presumed to be parallel, and fall perpendicularly or at right angles on the front, unless expressions in the deed control the legal intendment."

And to the same effect are the decisions in Henderson v. St. Charles Church, 7 Mart. (N. S.) 119, and Bourgeat v. Bourgeat, 12 La. 139.

Under these circumstances, with the upper line of tract B falling upon the front at a right angle, and the title calling merely for the usual depth of 40 arpents, we do not find it possible to extend the lower line along the meander of Bayou Ramos, which runs for some distance approximately parallel with the front of the tract, and then in a direction diverging from the upper line to the extent of 45 degrees. Nor does it meet this difficulty to say that the language "bounded * * * below, by land belonging to the estate of Mary E. Stansbury, decd.," controls what appears to be legal intendment with reference to tract B, as that language is inapplicable to tract B and was manifestly intended to be applied to tract E, as the lower of the two tracts constituting the one plantation that was being sold, and could, as matters were understood at that time, have been bounded below in no other way, since the estate of Mrs. Stansbury was then believed to be the owner of section 16, lying next below it, as it was, admittedly, the owner of the triangle F, and the pretension, if such there be, that any title to tract E ever called for land beyond Bayou Ramos, is utterly without support. Our conclusion on this point is that the plaintiff has exhibited no deed conveying to it a title to the land in dispute, and that the defendant, upon the other hand, has shown that he acquired title thereto from the heirs of the original owner.

As the plaintiff has exhibited no title, the prescription of 10 years does not apply. Civ. Code, arts. 3483, 3486; Clemens v. Meyer, 44 La. Ann. 390, 10 South. 797.

The prescription of 30 years, acquirendi causa, in order to be sustained, must be predicated upon uninterrupted, public, and une-

quivocal possession, "under title as owner." Civ. Code, art. 3500. Article 3503 reads:

"How favorable soever prescription may be, it shall be restricted within just limits. Thus in the prescription of thirty years, which is acquired without title, it extends only to that which has been actually possessed by the person pleading it."

Counsel for the defendant say, with much force:

"If one is permitted to claim all of the swamp land in his neighborhood on the plea of 30 years' prescription, then the plaintiff need not have stopped at the small tract of 500 acres which was owned by Martin and now by the defendants, but could have spread out his claim over the whole, and said, 'It is mine.'"

To sustain the plea, there must be, in the beginning, corporeal possession of the property, which, if not interrupted, may be preserved by external and public signs announcing the possessor's intention to preserve the possession of the thing, as the keeping of roads and levees, the payment of taxes, and other similar acts. Civ. Code, art. 3501. The evidence fails to satisfy us that either the plaintiff or its authors have, during the past 30 years, brought themselves within these conditions. In fact, it is proved that the plaintiff, through its officers, consented to and paid its proportion of the cost of a survey, which showed that it did not own this land, and that after Ditch had been pulling timber in 1900 its officers took the position, to which he assented, that he should pay for the timber already pulled from tract B (which according to the survey mentioned had been ascertained to belong to the plaintiff) and should pull no more from that tract, but made no objection to his pulling from tract A (which, according to the same survey, had been found not to belong to the plaintiff), and no claim for the value of the timber already pulled therefrom has been insisted on.

Boru O'Brien, a witness for the defendant, testifies upon that subject, in part, as follows:

"I went with him [referring to Dreibholtz, who is one of the three or four persons who appear to constitute the plaintiff company, and who was, apparently, the most active officer on the spot], at his request, to show him the lines which Mr. Kemper [by whom the survey referred to had been made] had run, and, incidentally, to count the timber. We struck the line, * * * and I showed him this line G D K [corresponding with the line M N on the sketch A]. We counted timber to the east of it. Q. Did you count the timber cut on this land in controversy? A. No, sir. Q. Was there any timber cut on this land in controversy by Ditch at that time? A. Yes, sir. Q. Who pointed out the timber and stood on the line? A. Mr. Dreibholtz stood on the line G D K, and we went back and forth and counted the stumps and made a memorandum of the number. Q. When you crossed the line what did he say? A. He would tell us when we got beyond the line, as we did not see the line when we got to it."

This counting was with a view of holding Ditch liable for the timber that had been pulled by him on plaintiff's property, and it seems evident that if Dreibholtz, whose testimony is much relied on as showing possession, had considered plaintiff the owner, in possession, of the tract A, there would have existed the same reasons for counting the timber upon that tract as upon tract B, to which latter tract, however, he confined his attention.

The plaintiff has, in the tracts B and E, including the triangle F, all the land that it ever purchased, or, as we think, possessed "under the title as owner," and all that it has ever paid taxes on, and its pretensions to the additional tract here claimed cannot be sustained.

(Since this case was submitted, the court has been informed of the death of the defendant Henry J. Sanders, and his heirs, Henry Shelby Sanders and Mrs. Leila Sanders, widow of Charles H. Hickox, deceased, of the parish of St. Mary, Mrs. Rilma Sanders, wife of Dr. J. L. Caldwell, of Arkansas, and Henry Sanders Hansell, of Kentucky, an interdict, represented by Wm. S. Hansell, his

curator, have been made parties defendant. There has also been filed in this court an authentic act whereby Mrs. Belle W. Sanders [née Shaffer], as widow of said defendant Henry J. Sanders, "renounces and abandons all rights and claims to any interest in the community of acquêts and gains" which had existed between her husband and herself.)

For the reasons assigned in the foregoing opinion, it is ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and there now be judgment rejecting plaintiff's demand and dismissing its suit, at its cost.